**Andrew J. KAELIN et al., Plaintiffs,**

v.

**William B. WARDEN et al.**

**Civ. A. No. 70-2341.**

United States District Court,
E. D. Pennsylvania.

July 6, 1971.

---

Kraft, Senior District Judge, dissented and filed opinion.

Before SEITZ, Chief Circuit Judge and KRAFT and LUONGO, District Judges.

## OPINION

SEITZ, Chief Circuit Judge.

Plaintiffs, qualified voters and registered members of the Democratic Party in Bucks County, Pennsylvania, bring this action essentially seeking to enjoin

defendant William B. Warden (Warden) from participating in the office of County Commissioner of Bucks County on the ground that his appointment to fill the vacancy in that office was based on a statute which is unconstitutional on its face or as administered by the appointing authority. A three-judge district court was designated and thereafter entered an order directing a hearing upon the issue of the constitutionality, on its face, of the challenged Pennsylvania statute and the issue of whether the constitutionality of the statute, as administered and applied, should be determined by a three-judge district court. This is the determination of those issues after hearing.[1]

The following facts were stipulated by the parties. Joseph O. Canby (Canby), a registered Republican, was elected a County Commissioner of Bucks County in a general election held on November 7, 1967, for the term commencing January 1, 1968 and expiring the first Monday in January 1972. On June 8, 1970 Canby resigned. On August 4, 1970, the Court of Common Pleas of Bucks County appointed Warden, a registered Republican elector of Bucks County, to fill the vacancy for the balance of the term.

The election of Canby and the appointment of Warden were pursuant to Title 16, Chapter 1, § 501 of the Pennsylvania County Code which provides:

"(a) Three county commissioners shall be elected in each county in the year one thousand nine hundred and fifty-five, and every fourth year thereafter.

In the election of commissioners, each qualified elector shall vote for no more than two persons. The three persons having the highest number of votes shall be elected.

"(b) Any casual vacancy in the office of county commissioners shall be filled, for the balance of the unexpired term, by the court of common pleas of the county in which such vacancy shall occur by the appointment of a registered elector of the county who was a member of the same political party as the commissioner whose place is to be filled at the time the commissioner was elected." [2]

Plaintiffs, in challenging the statute on its face, aver that it deprives them of rights guaranteed by the Equal Protection and Due Process Clauses of the Fourteenth Amendment and of a republican form of government guaranteed by Art. IV, § 4 of the Constitution.

We turn first to plaintiffs' contention that § 501(a) abridges the principle of "one man, one vote" as developed in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its progeny. We do so even though we recognize that it is arguable that under the present facts that precise issue may not be properly before us.

 It is clear that the principle of "one man, one vote" is applicable to the election of County Commissioners of Bucks County. The board of commissioners performs important governmental functions and has powers which have a sufficient impact throughout the county [3] to justify the application of the de-

---

1. As indicated by the opinion filed herewith, a majority of this court is satisfied that plaintiffs' attack on the constitutionality on its face of the Pennsylvania statute establishes jurisdiction of the three-judge court under 28 U.S.C. § 2281.

2. 16 P.S. § 501. This statute was enacted pursuant to a provision of the Constitution of the Commonwealth of Pennsylvania which provides:
 "Three county commissioners shall be elected in each county. In the election of these officers each qualified elector shall vote for no more than two per-

sons, and the three persons receiving the highest number of votes shall be elected." P.S.Pa.Const. Art. 9, § 4.
This same section also provides that "all vacancies shall be filled in such a manner as may be provided by law."

3. The authority of the board of county commissioners includes the power to adopt ordinances generally regulating the affairs of the county, to prescribe fines and penalties for violations of these ordinances, to set salaries for county employees, to manage the fiscal affairs of the county, to tax, to regulate the use of land by zon-

mand of the Equal Protection Clause that the vote of each elector insofar as it is practicable, must be given the same weight as that of any other elector. Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

By enacting § 501(a) Pennsylvania has chosen to utilize a scheme known as limited voting.[4] Since each elector is restricted to voting for two of three commissioners to be elected and since the majority and minority parties each ordinarily nominate two candidates, it is expected that the choice of the largest minority will ordinarily be elected as one of the commissioners. Plaintiffs assert that as a result of this scheme, one commissioner who assumes office must necessarily have been rejected by a majority of voters and elected by a minority of voters. Since in the board of commissioners an elected minority commissioner is given a vote equal to that of an elected majority commissioner, plaintiffs conclude that the votes of majority party electors count for less than those of the minority. Such a result, they say, violates the principle of "one man, one vote."

Plaintiffs' attack on the statute derives from what we believe to be a specious conception of its effect and a misplaced reliance upon the principle of "one man, one vote." The statute does not, as plaintiffs assert, insure the election of a commissioner who was rejected by a majority, but rather its purpose is to encourage the election of members of both major political parties. Commonwealth ex rel. Teller v. Jennings, 409 Pa. 513, 186 A.2d 916 (1963). In fact, the effect of the statute is never wholly predictable for it is possible for a board of commissioners to be elected consisting of three members of the same party, three members of different parties or three independents. Commonwealth ex rel. Teller v. Jennings, supra; Common-

wealth v. Wise, 216 Pa. 152, 65 A. 535 (1907).

■ Under the Pennsylvania scheme each elector necessarily has the same relative voting strength since each is permitted to cast two votes and the election is at-large. The Equal Protection Clause is thus satisfied, Hadley v. Junior College District, supra, 397 U.S. at 56, 58, 90 S.Ct. 791, unless plaintiffs can demonstrate that this scheme is designed to dilute the voting or representational strength of a particular political element. Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). Plaintiffs cannot sustain this burden by demonstrating merely that the statute encourages representation for political minorities or by a showing that in a particular instance a particular minority has succeeded in electing a commissioner. Nothing in the Constitution militates against a scheme which is designed to encourage some minority representation, unless it can be shown that it results in invidious discrimination, which we cannot find. Cf. Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971).

■ The statute may be viewed as having an effect which encourages a fairer or more effective representation than would otherwise result if a simple plurality rule were used in which the majority elects all the commissioners, for this would necessarily discriminate by entirely discounting the votes of the minority electors. No compelling reason has emerged to cause us to inhibit the state from attempting to achieve what it considers to be a legitimate political goal. The Supreme Court has often recognized that the states should be afforded flexibility to tailor viable local governmental structures to meet their particular needs. Hadley v. Junior College District, supra, 397 U.S. at 59, 90 S.Ct. 791; Avery v.

---

ing, to regulate public health, to condemn land, and to maintain a police force. 16 P.S. §§ 203, 509, 1620, 1701, 1720, 1771, 1901, 2020, 2110, 2401, 2507, 2511, 2675, 2676, 11504, 12189.

4. R. Dixon, Democratic Representation 521 (1968).

Midland County, 390 U.S. 474, 485, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Sailors v. Board of Education, 387 U.S. 105, 110–111, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). We hold that the scheme reflected in § 501(a) is one such acceptable method. See Blaikie v. Wagner, 258 F. Supp. 364 (S.D.N.Y.1965).

Plaintiffs next contend that the power delegated to the Court of Common Pleas to appoint an interim successor to fill a casual vacancy in the office of county commissioner deprives them of the rights to a republican form of government guaranteed by Art. IV, § 4 and to Due Process and Equal Protection guaranteed by the Fourteenth Amendment.

■ We are unable to consider plaintiffs' claim under the Guaranty Clause for it has long been established that this clause is not enforceable through the courts in this context since it does not provide manageable judicial standards and presents questions which are political in nature. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917); Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). The nonjusticiability of the claim resting upon the Guaranty Clause, however, does not prevent us from considering plaintiffs' claims under the Fourteenth Amendment. In Sailors v. Board of Education, *supra*, the Court found that there was no constitutional reason why local officers of non-legislative character could not be appointed to office. However, the Court indicated that it was not deciding whether a state may constitute a local legislative body through the appointive rather than the elective process. See Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966); Harper v. Virginia

Board of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Soliah v. Heskin, 222 U.S. 522, 32 S.Ct. 103, 56 L.Ed. 294 (1912); Wallis v. Blue, 263 F.Supp. 965 (N.D.Ga.1967). Nor are we compelled to decide that question here.

■ In this case we are presented with the question of whether one member of a three member elected board can be appointed in order to fill a casual vacancy. The use of an appointive process as a means to fill an interim vacancy is not foreign to our traditional notions of representative government. In fact, an appointive procedure is specifically condoned by the Seventeenth Amendment in order to fill vacancies in the United States Senate. See Valenti v. Rockefeller, 292 F.Supp. 851 (W.D.N.Y.1968), aff'd, 393 U.S. 405, 89 S.Ct. 689, 21 L. Ed.2d 635 (1969). A compelling state interest is furthered by the use of an interim appointment as a stop-gap measure designed to avoid delay in the discharge of public business, particularly when the vote of the third member is often necessary to obtain a majority vote. We therefore conclude that the provisions for appointment by the Court of Common Pleas is a reasonable means to achieve a legitimate state purpose.[5]

■ Plaintiffs assert next that the limitation in § 501(b) which only permits the appointment of a member of the same political party as the commissioner whose place is to be filled debases the right to vote of all citizens in the county who are not members of the same political party as the former office holder. This they claim violates the Equal Protection Clause of the Fourteenth Amendment.

Before confronting this challenge, we must first determine the right which plaintiffs are asserting. What plaintiffs seem to assert is a right which is consid-

---

5. Plaintiffs point to Pennsylvania statutes providing for the filling of vacancies in other offices by special election, and conclude that there is invidious discrimination against citizens in the conduct of county government and in the grant of the franchise as it pertains to counties. We find no merit in this since the appointive process of filling vacancies reflects a compelling state interest and the legislature need not run the risk of losing an entire remedial scheme simply because it failed to provide for this in other areas. See McDonald v. Board of Election Com'rs of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

erably broader than the right to vote—a right to have one of their representatives chosen from the entire constituency and not just a limited class.

We can judicially notice that all electors who vote for county commissioners do not necessarily vote for a particular commissioner because he is the member of the particular political party. That is, some electors are no doubt independents and vote for the man, not the party. The lack of party loyalty is apparent from those elections in which a candidate receives more votes than his party has registered voters. See Commonwealth ex rel. Teller v. Jennings, supra, 186 A.2d at 918 n. 5 (Pa. 1963).

Plaintiffs contend that § 501(b) improperly distinguishes between those who voted for Canby as an embodiment of his party's views and those who voted for Canby as a man without considering his party affiliation, and that the statute is unconstitutionally underinclusive since it benefits the former group (because Canby was a Republican and they are to be represented by a Republican in his place) and arbitrarily ignores the latter group. This, they contend, bears no reasonable relationship to any legitimate state objective and establishes an impermissible classification, one which fosters perpetuation of the type of representation that some originally voted for and denies the same treatment to others. Thus, the right that plaintiffs assert can be viewed as a right to equal representation. See generally Note, Reapportionment on the Sub-state Level of Government: Equal Representation or Equal Vote? 50 B. U.L.Rev. 231 (1970).

We are aware of the panoply of rights which derive from the right of representation and that classifications which invade or dilute this right must be closely scrutinized and carefully confined. However, in considering this method of interim appointment we do not require the "exacting standard of precision" ordinarily required where the vote itself is directly involved. *Compare* Burns v. Richardson, 384 U.S. 73, 90–97, 86 S.Ct. 1286 (1966), *with* Kramer v. Union School

District, 395 U.S. 621, 632 (1969); McDonald v. Board of Election Com'rs of Chicago, 394 U.S. 802, 807, 89 S.Ct. 1404 (1969); Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1968). Since the classification involved in § 501(b) is based on political party affiliation, to save it from constitutional attack it must be shown that this classification furthers a legitimate and substantial state interest. Can such state interest be found here?

The state proffers a substantial interest to justify the classification in question. It asserts that the appointive procedure provides for the orderly administration of counties without, in some instances, a hiatus in the operation of government. Furthermore, the requirement that the appointee be a registered elector of the same political party as the commissioner whose place is to be filled is necessary to maintain the scheme of majority-minority representation. Finally, while one may well question the assumption, it is assumed that the political qualification on the appointment enhances the chance of continuity of representation in that the appointee is more likely to share the views of his predecessor in office.

These justifications may not be properly classified as an attempt to benefit the state in some remote administrative manner, see Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), or an attempt to deal with a remote danger which is theoretically imaginable, see Williams v. Rhodes, 393 U.S. 23, 33, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). The statute furthers the preservation of a legitimate state objective in an area in which the state has a compelling interest. Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); cf. Turner v. Fouche, 396 U.S. 346, 361, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). The alternatives open to the state which would represent a more exacting way to achieve this end are not apparent to us. We cannot very well require a special election in the case of every casual vacancy since such a pro-

cedure is costly in terms of time, which is of considerable importance in a three member body. In addition, a general election of all electors in the county will discriminate against those who originally used one of their two votes to vote for the commissioner who vacated his seat. Those who did not vote for him (i. e. the Commissioner who vacated his seat) will then have had the opportunity to vote for a person to fill each of the three seats on the new board while those who did (i. e. vote for the Commissioner who vacated his seat) would only have been able to vote for a person to fill two of the seats. Also, such an election will frustrate the desired purpose of minority representation if the vacancy is the minority seat. To require that the appointee be chosen from the entire electorate again may lead to the undesirable result of no minority representation.

Plaintiffs claim, however, that there is an alternative open to the legislature which would provide a more exacting method of fulfilling the legislative purpose. They assert that the Pennsylvania legislature has provided for such an alternative in the legislation which governs counties of the second and second A classes [6] reflected in 16 P.S. § 3501(b) [7] which provides:

"Any vacancy in the office of county commissioners shall be filled for the balance of the unexpired term by the court of common pleas of the county, by the appointment of an elector of the county who voted for the commissioner whose place is to be filled."

As in the case of § 501(b), this statute also establishes a classification. We have not been convinced, however, that § 3501 (b) provides for a more exacting and reliable method of fulfilling the legislative

purpose. It provides one device which could aid in achieving the desired goal that those eligible to fill the vacancy share views similar to those of the commissioner whose departure created the vacancy. However, it is quite possible that an elector, eligible under § 3501(b) for appointment, voted for the original commissioner as a result of considerations entirely foreign to those which compelled a similar vote by other electors, and that he maintains views which are considerably different than those of his fellows.

■ To say that § 3501(b) reflects a more desirable method of obtaining the intended result is, we believe, to make a legislative judgment. The Constitution does not forbid the state from experimenting by utilizing disparate methods for different counties.

■■ Plaintiffs also assert that they are denied equal protection of the laws since they as citizens of Bucks County, a third class county governed by § 501 (b), are not afforded the same treatment as citizens of counties of the second and second A classes who are governed by § 3501(b). This contention misconceives the nature of the Equal Protection Clause which requires that persons be similarly situated in order to obtain its protection. "It contemplates persons and classes of persons. It has not respect to local and municipal regulations that do not injuriously affect or discriminate between persons or classes of persons within the places or municipalities for which such regulations are made." Missouri v. Lewis, 101 U.S. 22, 30, 25 L.Ed. 989 (1879). Hence, it has long been held that the equal protection guaranty does not require uniformity of treatment of persons in different territories within a

---

6. Counties of the second and second A classes include those counties with populations of less than 1,800,000 inhabitants but more than 500,000 inhabitants. Section 501(b) is applicable to third through eighth class counties which include those counties with less than 500,000 inhabitants. Bucks County is a third class county.

7. Plaintiffs take the inconsistent position that § 3501(b) is also unconstitutional and further request that we declare it so. However, we decline to pass upon the merits of § 3501(b) for it is not in issue in this case and any decision we would reach would merely be an advisory opinion.

state. Ocampo v. United States, 234 U.S. 91, 98, 34 S.Ct. 712, 58 L.Ed. 1231 (1914). In this regard, the presumption of validity is with the state, Salsburg v. Maryland, 346 U.S. 545, 550–554, 74 S.Ct. 280, 98 L.Ed. 281 (1954), and the record is barren of any indication that the situation in the different counties might not rationally call for different treatment. *Compare* McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), *with* Griffin v. County School Bd., 377 U.S. 218, 230–231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

We therefore conclude that the challenged Pennsylvania statute is constitutional on its face and to the extent the amended complaint is based on a contrary claim it will be dismissed.

Plaintiffs' final claim is that the manner in which the Court of Common Pleas of Bucks County exercised its statutory prerogative under § 501(b) was unconstitutional. They assert that the electors of Bucks County were given inadequate notice of the then pending appointment, that the manner in which the Republican Party selected three people to recommend to the Court did not comply with federal constitutional standards, and that the Court only considered the recommendations of the Republican Party in selecting the new county commissioner. Standing alone, this claim does not question the constitutionality of the statute; rather it questions whether the Court of Common Pleas exercised its power in a constitutionally permissible manner. Such a claim cannot be said to be an attack upon the statute "as administered and applied." Wright, Handbook of the Law of Federal Courts 190 (2d ed. 1970). Therefore plaintiffs' final claim cannot properly be heard by a three-judge district court, Pittsburgh & W. Va. Ry. v. United States, 281 U.S. 479, 488, 50 S.Ct. 378, 74 L.Ed. 980 (1930), but must be heard by a single district judge. Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Ex parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940). To that end this court will dissolve itself and remit the reserved issue to a single district judge.

KRAFT, Senior District Judge (dissenting).

The prime subject of inquiry in this action is whether a state election statute may constitutionally condition the filling of a casual vacancy in the office of county commissioner, for the balance of an unexpired term, upon the qualification that the appointee be "a member of the same political party as the commissioner whose place is to be filled at the time the commissioner was elected." [1]

A three-judge Court was convened to consider the plaintiffs' constitutional questions [2] and a hearing was held on the merits of plaintiffs' complaint and application for injunctive relief.

In their complaint, as amended, plaintiffs contend that the

" * * * Act denies due process of law and equal protection of the law to Plaintiffs on account of Plaintiffs' political party affiliation and does not afford plaintiffs an opportunity to be notified of, or to be heard on, or to

---

1. 16 P.S. § 501

"Election; Vacancies

(a) Three county commissioners shall be elected in each county in the year one thousand nine hundred and fifty-five, and every fourth year thereafter. In the election of commissioners, each qualified elector shall vote for no more than two persons. The three persons having the highest number of votes shall be elected.

(b) Any casual vacancy in the office of county commissioners shall be filled, for the balance of the unexpired term, by the court of common pleas of the county in which such vacancy shall occur by the appointment of a registered elector of the county who was a member of the same political party as the commissioner whose place is to be filled at the time the commissioner was elected."

2. 28 U.S.C.A. §§ 2281 and 2284.

participate in who will be plaintiffs' representative or choice of government of the County." [3]

The genesis of this action arose on June 8, 1970, when Joseph O. Canby, an elected county commissioner of Bucks County, Pennsylvania, resigned his office.[4] Thereafter, on August 14, 1970, pursuant to section (b) of the statute in question, defendant William B. Warden, a member of the same political party as Canby was appointed by the Judges of the Court of Common Pleas of Bucks County to serve the balance of Canby's unexpired term. This appointment precipitated the instant action by plaintiffs, who are all residents of Bucks County, qualified voters and members of the Democratic Party.

Pennsylvania's 67 counties are divided by population into nine classes.[5] Philadelphia is the only first class county. The remaining 66 counties are subject either to the Second Class County Code [6] or the County Code regulating the municipal affairs of third to eighth class counties.[7]

The Second Class County Code [8] also provides for the filling of a commissioner vacancy, but, unlike the County Code, does not require the appointee to be of the same political party as his predecessor. Both provisions are derived from Section 7 of Article XIV [9] of the Pennsylvania Constitution of 1874, as amended November 2, 1909, which reads as follows:

"Section 7. Three commissioners and three county auditors shall be elected in each county, where such officers are chosen, in the year one thousand nine hundred and eleven and every fourth year thereafter; and in the election of said officers, *each qualified elector shall vote for no more than two persons,* and the three persons having

---

3. Paragraph (d–1), in part, of plaintiffs' second amended complaint.

4. Canby had been elected on November 7, 1967.

5. 16 P.S. § 210
 "Counties Divided Into Nine Classes For the purposes of legislation and the regulation of their affairs, counties of this Commonwealth, now in existence and those hereafter created, shall be divided into nine classes as follows:
 (1) First Class Counties, those having a population of 1,800,000 inhabitants and over.
 (2) Second Class Counties, those having a population of 800,000 and more but less than 1,800,000 inhabitants.
 (2.1) Second Class A Counties, those having a population of 500,000 and more but less than 800,000 inhabitants.
 (3) Third Class Counties, those having a population of 250,000 and more but less than 500,000 inhabitants.
 (4) Fourth Class Counties, those having a population of 150,000 and more but less than 250,000 inhabitants.
 (5) Fifth Class Counties, those having a population of 95,000 and more but less than 150,000 inhabitants.
 (6) Sixth Class Counties, those having a population of 45,000 and more but less than 95,000 inhabitants.
 (7) Seventh Class Counties, those having a population of 20,000 or more but less than 45,000 inhabitants.
 (8) Eighth Class Counties, those having a population of less than 20,000 inhabitants."

6. 16 P.S. §§ 3101 to 9100.

7. 16 P.S. §§ 101 to 3100.

8. 16 P.S. § 3501
 "Election; vacancies
 (a) Three county commissioners shall be elected in the county in the year one thousand nine hundred and fifty-five and every fourth year thereafter. In the election of commissioners, each qualified elector shall vote for no more than two persons. The three persons having the highest number of votes shall be elected.
 (b) Any vacancy in the office of county commissioners shall be filled for the balance of the unexpired term by the court of common pleas of the county, by the appointment of *an elector of the county who voted for the commissioner whose place is to be filled.*" (emphasis ours).

9. This Article was replaced by Article IX § 4 of the present Pennsylvania Constitution adopted in 1968 which contains the same limitation upon the electorate as the former Article XIV and further provides "* * * all vacancies shall be filled in such manner as may be provided by law."

the highest number of votes shall be elected; any casual vacancy in the office of county commissioners or county auditor shall be filled by the court of common pleas of the county in which such vacancy shall occur, *by the appointment of an elector of the proper county who shall have voted for the commissioner or auditor whose place is to be filled.*" (emphasis ours).

At the outset, it is important to note certain well-defined constitutional principles which are pertinent here. No longer is it open to question that "[T]he actions of local government *are* the actions of the State. A * * * county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law." Avery v. Midland County, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968). While a state may legitimately distinguish among citizens, provided such distinctions are not arbitrary or invidious, "[A]ny unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." Kramer v. Union Free School District, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969).

It is apparent from even a cursory reading of 16 P.S. § 501 that the Legislature of Pennsylvania, contrary to its own Constitution and the Equal Protection Clause of the Federal Constitution, has discriminated in making *political affiliation,* the controlling qualification for filling commissioner vacancies in Third to Eighth Class Counties. The rationale for this distinction is claimed to be the preservation of the state-wide system of majority-minority representation in local government, as mandated by the State Constitution, in order to provide the electorate with a "watchdog" over the operations of County government. However, this governmental philosophy applies as well to Second Class Counties, but is there implemented by a complete disregard for the political affiliation of the

appointee. I am unable to discern any legitimate state purpose served by the invidious restrictive distinction contained in Section 501(b), which, inter alia, limits its eligibility for consideration for appointment to a vacancy in this office to registered electors of one political party. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1962).

Contrary to the arguments of counsel, I see no need to determine here that Pennsylvania's Constitution, which provides for majority-minority representation in local government, conflicts with the Equal Protection Clause. No direct attack on this principle was made by plaintiffs in their complaint, as amended, and the relief requested could be granted without proceeding further. "This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems." Avery v. Midland County, 390 U.S. supra 485, 88 S.Ct. 1120. Accordingly, I would go no further than to hold that the political affiliation requirement of Section 501 (b) establishes an arbitrary distinction among citizens otherwise eligible for appointment to fill such vacancy and, as well, to participate in the selection of public officials and, so, is violative of the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution.

While the effect of such a determination would necessarily vitiate the appointment of Commissioner Warden, I would not abrogate the power of appointment for casual vacancies conferred by Section 501(b) upon the Court of Common Pleas. The State has an overriding legitimate interest in the orderly continuation of the operations of local government, which, when interrupted by the resignation or death of an elected official, must be remedied as soon as possible. Therefore, the appointment of a successor by the Court of Common Pleas

is an expeditious and effective method of restoring the full complement of Commissioners. This appointive power in no way abridges the franchise held by the electorate, which remains unimpaired, to be exercised quadrennially. Consequently, I perceive no violation of the Equal Protection Clause in the utilization by the State of an appointive method to meet the exigencies of an unusual situation, absent the discriminatory limitation.